The last case this morning is In re. Marriage Eberhardt for the appellant number 411144. For the appellant is Michael Costello. For the appellant is Ben Ryan. Mr. Costello, may I proceed, sir? Thank you, Your Honor. May it please the Court. Mr. Ryan. Counsel. First off, Mrs. Ryan correctly pointed out that I miscited a case, a holding that I cited on page 24 of our brief where I said, In re. Marriage Eberhardt for the holding that a division of property of 85% and 15% was not in favor of Hardy, was not abuse of discretion. That is a correct citing of the holding, but that case is Ward, Phyllis Ward v. Ward, a 1st District appellate court case cited as 282 Illinois Appellate 3rd, 423, 668 Northeast 2nd, 149. And I apologize to the Court and to Mrs. Ryan for that egregious miscite of a case. As to the facts of this case, there are three issues. Division of property, which involved the house, Dr. Eberhardt, the respondent, requests that he be awarded the full equity of the house. Moving on to the main issue, whether or not Judge Brough abused his discretion in denial of maintenance to Dr. Eberhardt. Dr. Eberhardt is a chiropractor aged 65 years of age. His business has been going downhill ever since. He had 85% of his chiropractic clients were from the state of Illinois, they went to HBO, and that's very slow pay he says. He's still in practice at 65. He gets a gross income at this time of $28.11 per month plus $1500 social security. He has expenses of operation of $18.58 and other expenses where he nets $2400 approximately a month. The petitioner is also a physician, she's a psychiatrist employed at McFarland and she earns approximately $140,000 a year. There are two children born in the marriage. One had severe problems when he was born up to about 5 or 6. That child is named Luke, he's about 6 years old now. And the other child has very, very severe problems. He may be autistic, he's had medical problems from birth. It's costing the petitioner approximately $1800 just for sitting fees. And she is to bear all the medical costs of this child and also the babysitting costs. Custody was not an issue. The respondent agreed to custody too. She's a good mother. Why are we here? Monica, the petitioner earns approximately $140,000 a year. He earns, he nets out approximately $2453. He's 65, at the time of trial she was 42. There's a 20 year age gap. And we suggest that on those facts alone that the husband is going to have to retire. What about the fact that he doesn't have to pay child support? Valid consideration, Justice, yes. He does not pay child support. He doesn't have the money. The court did not impose upon him child support, I believe, in lieu of, in consideration of his income. That's all I can think of. The court didn't say why. But she bears all the costs of care and everything else for the minor child, Paul, who's the problem. He may well be autistic. How can we say that the trial court's call is improper? When he puts some burdens on her and some burdens on him. I understand that. But she is in a position now to earn $100,000, the money she makes, because of the efforts and contributions of the respondent. She was born in Romania and obtained a medical degree there and wanted to come to this country. He wasn't supporting her at that time? No, he wasn't. Justice, excuse me. Anyway, it's of record that she was earning per month, just before she came over, $20 a month U.S. dollars. She married Eberhardt. She came to this country. Now, she was licensed in Romania and was a general practitioner. And she came to this country and had to go through a series of tests to be licensed in the United States. And the petitioner, Don Eberhardt, according to his testimony, expended hours and hours with her, showing her where to go, getting test forms, helping her pass the English exam. She successfully passed everything. Then she wanted, she was having trouble getting into a residency. He suggested that she look for the name across the country in any residency for a Romanian doctor. She did find one, or he found it, in Ohio. And they contacted the Romanian doctor and he suggested to her, whether she said this to him or not, that she felt she was being discriminated against because she was Romanian. So she went on this. This was a fellowship. It was sort of an added certificate to help her get a residency. She spent, I believe, three months or four months in Ohio, successfully followed the doctors around on this fellowship, and then took up a residency. She took up a residency in psychiatry. Completing her residency, she came, she was, they lived in Springfield, by the way, and she came back and she went ultimately with McFarland. She had been offered a job at Vine Street Clinic. She turned that down and went to McFarland. And she's at McFarland because her hours are flexible and she only has to work three or four days a week. Now, no one is going to even suggest that she's not a tremendous mother, that she is a wonderful caretaker for these children, especially Paul, the autistic possibility. But taking all of this information, his contributions to her obtaining an education, bringing her to this clinic, passing the test. She spent her residency in St. Louis? Yes, Your Honor. She was living with her parents at that time? Her parents came over to help care for the children, that's correct. So he wasn't supporting her at that point? Well, he suggested he was. And he would go down there four or five times, according to his testimony, a week and help her. Whether he was contributing money, the record is silent as to that. She was earning a living while she was there. We only rely, and I think it's a good reliance, on the contributions to her and the future earning capacity that she's going to have and he won't have. It's, he's 65, married in good faith, as we all do, and he's divorced and he's not, in his twilight years, not able to... Is he still working? He is, Your Honor, Justice, he is. He says he's going to have to shut down because, one, he doesn't have the patience, patience diminished, and he's in financial trouble on the building. That's a record, too, the office building, what he says. The bank is pressing him for money. But he will work, but how long do you work after 65? Work. Unless you want to. Those are the salient facts pertaining to the maintenance and why there's just a disparity in income and his efforts to put her in a position where she's at now, those years. During the period of time that she was studying for all these tests and passing them, no children were born. They had their first child after she came back from St. Louis. As to attorney's fees, the disparity in income, the respondent requested attorney's fees, which was set forth in his pre-trial memorandum. He initially had a temporary motion for attorney's fees, and the court requested them at the end of the trial, and the trial judge dismissed it. We're suggesting that the wife could well have paid the attorney's fees. The trial court talked about the attorney's fees and so forth, and talked about the parties themselves in the court proceeding, didn't it? Yes, Your Honor. It didn't paint Mr. Everhart in the greatest movement, did it? No, it did not, Your Honor. If I might explain, initially there was an issue as to whether or not she was in this country legally, and that was brought to the attention of the trial judge. No proof could be obtained as to that, and maybe one petition was filed on it. There was no court hearing over whether or not she was legally in the country or not. And a claim was made for dissipation. Based upon the facts, there was no divorce proceedings, they weren't going at it with hammer and tongs emotionally until the end. Well, one salient fact came out, and that was that when she came back from St. Louis, she told him that, I no longer want to be married to you, or I no longer need you. We, the family, have decided we no longer need you. Now, that was said when she came back. And then she continued to pay dissipationists. She paid approximately $400 a month to Romania. There were other payments made that Don had agreed to earlier to the family. And we claimed that this statement, we no longer, or I no longer need you, triggered dissipation, and triggered that the marriage was going downhill, to permit an award of dissipation under O'Neill. O'Neill holds that, unless the marriage is undergoing a breakup, you can't claim dissipation for money spent. With that, I don't waive any of the arguments made in the brief, but unless the court has some other questions, I have nothing further. Thank you, counsel. Ms. Ryan. Please, the court. Counsel. Counsel, and Dr. Eberhardt, who I will refer, unless you have an objection, as Monica, simply because there's two Dr. Eberhardts here, so I'll refer to them as Monica and Don. In terms of when the children were born, Luke, the oldest, who's now seven, was actually born prior to my client starting her position that she was in Missouri for, which was a paid position. And she did support herself, and that is in the record, and she supported the child. There was some discrepancy in the testimony regarding how often Don Eberhardt would come and see her in St. Louis. My client's testimony was it was maybe weekly. Her parents did come to care for Luke, who was an infant at that time. And in terms, there was arguments that my client had sent $200 a month to her parents, which she had done over a fairly significant period of the marriage. All the testimony was that that had all ceased by the time the marriage had broken down. She had ceased doing that. And then these folks came and also helped her so that she didn't have to pay child care costs for an infant when she was pursuing her fellowship in Missouri. In terms of contributions to the marriage, like every marriage, both parties contributed to the marriage. And certainly Don Eberhardt drove Monica to certain things and so forth. Monica, in her testimony, certainly denied the number of hours he indicated that he assisted her in studying for exams. And really, by the time she came to the country, that's what it was all about, was studying to pass her English proficiency exam, because that was not her first language, and passing these clinical tests and preclinical tests that she had to pass. So she testified it was a pretty solo pursuit to try to pass these tests. She then, after she passed these tests, she got a residency at SIU, which she was paid between $35,000 and $40,000 a year for. And with respect to these residencies, she provided insurance for the entire family, both for Don Eberhardt herself and his children. She didn't have children at the time. In addition, before she started her residency and while she was studying for these exams, she worked for Memorial Medical Center as a CNA, a certified nurse assistant. She worked some very tough jobs that we don't normally think of a physician working. She was an electro-nursing technician. She stocked shelves at Michael's. She worked for Don Eberhardt at his office as a secretary. This is a lady who came over here, and it was not a case where she was just taken care of. She contributed and contributed substantially to this marriage. One of the things that counsel didn't address is that Don Eberhardt, in applications that he filled out to the bank, I believe one of them was in 2009, valued the building that his medical practice was in, which he got rent for. The business paid rent to him for that. And I believe it was close to $2,000 a month that was paid in rent to him for that. That with respect to that building, it was worth $375,000. He said that his equipment was worth $80,000. He said he had very substantial accounts receivable. He said that the business itself was worth $70,000. In 2010, there were deposits into his bank accounts of in excess of $143,000. So in terms of Don Eberhardt saying that he's poor, that he doesn't have income, it was very hard to get a grasp on that during the course of the case because we have him saying in a bank application that his income is one thing. We have bank accounts showing another thing. We have varying financial affidavits that decrease his income. How much longer do you think he can work? I don't know. I don't know. I do know that he's getting $1,500 a month in Social Security benefits in addition to whatever money counsel was talking about. He's also getting that. We have a child here that my client has full custody of. He has two kids, one 7 and one almost 5. This 5-year-old is extremely disabled. He's nonverbal. He's a 4-year-old who is nonverbal, cannot drink out of a cup. He has conditions. Visually you'd see him has a big head. It's a condition called dyspraxia. He has strabismus. He's cross-eyed. He has serious heart problems. He's not potty trained. He's a child that not only requires very substantial financial outpouring, he requires very substantial commitments from my client in terms of time. She works part-time, and she works at McFarland's because that job gives her the flexibility to tend to the needs of this child. And so, yes, though Don Eberhardt is 65 years old, we have a baby, a 4-year-old, who is severely disabled. My client is basically the lifeline who she is taking care of this little boy. The in-home care so that my client can work is about $2,000 a month. The other little boy who, by the way, has had cancer, he's had serious problems also, but he's doing well now. He goes to a Montessori school that's $800 a month. So when you do the analysis of my client's cash flow, there are three different therapists that tend to this little boy. A lot of that is out-of-pocket, special foods because of the necessity of trying to get calories down this little boy. Her expenses are very high and always will be. There is no promise of there being anything but very high expenses relating to these children. And I think that the judge was trying very hard to balance, okay, we do have a 65-year-old dad, but we also have a 15-year marriage. We have an established practice. He's had a chiropractic practice forever. We have a mom with custody of two little boys who has a long way to go. And I think what the judge was trying to do was balance that. I'm not going to order child support, but I'm certainly not going to order her to pay maintenance when virtually every dime she makes is needed to support this expensive household and not expensive because they go on vacations or anything of that sort, expensive because we've got little kids with very substantial needs. What is the basis for the children receiving Social Security? Because during the course of proceedings, he reached the age of 65. He applied for Social Security for himself, and therefore the children got Social Security. And under the Social Security rules, Social Security monies are paid to the custodial parent, and the judge made very clear that he wanted the Social Security monies paid to my client who was caring for the children. In terms of attorney's fees, which they've appealed, and they want Monica Eberhardt to pay Don Eberhardt's attorney's fees, one of the big issues in this case was the amount of time that was expended. It was openly declared in court, not by Mr. Costello, but by another attorney working for Don Eberhardt, that there was an attempt to deport my client, that they were actively trying to get her deported from the United States. They said, oh, she was fraudulently here. She's been a citizen since 2001. This case was delayed, trial was delayed, because they said that they were going to go get documentation of the fact that she's here illegally, and that they wanted these children to stay here, and they wanted her deported. And the judge did, and that's what he was referencing at the last part of his decision, was that, look, I'm not going to be ordering her to pay attorneys with fees for things of that sort. Bottom line is, with respect to assets, Don Eberhardt was awarded 65% of the assets. My client was awarded 35% of the assets. He got half of her state pension, half of her deferred compensation account, which, of course, we would rather have seen her got more of that, but we understood what the court was attempting to do in that regard. There were things, in terms of attorney's fees, where counsel, and I appreciate him saying it, said that my client's a very, very good mother, and I believe she is, and there was an agreed custody order placed in custody of these children. There was a big brouhaha at the start of this case, where a petition for temporary relief was filed by Don Eberhardt, where he alleged horrible things against my client, that she was poisoning children, a DCFS investigation commenced, which ended with these children, with DCFS saying, take those kids and go somewhere, to my client. So there was a lot, I believe, that went into the court, ruling in the manner in which it ruled in this case. If there are any questions, I am more than happy to answer them, but I don't want to prattle on, because I think I've made my point, unless there are questions that you would like me to answer. I see none. So, if you're otherwise done, that's fine. Okay. Thank you very much. Okay. Thank you, counsel. Mr. Castello on your medal, sir? Very quickly, though. Okay. Just to clarify, the income of Eberhardt at the present time of record, gross income $2,811, plus $1,500 Social Security, expenses of $1,858, he has net $2,453 to live on. To clarify, Don, both of them in good health? Yes, Your Honor, you did. They are in good health, except, if I may clarify, Don has had two heart surgeries, but during this trial, at least when I came into the trial, he appeared to be healthy and normal. No complaints. But he did have two prior heart surgeries. If there aren't any more questions, thank you very much, Your Honor. Thank you, counsel. We'll take this matter under recess. On your right.